COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-167-CV

NO. 2-07-168-CV

 

 

UNION SQUARE FEDERAL CREDIT                                        APPELLANTS

UNION AND DAVID NORRIS

 

                                                   V.

 

RICHARD R. CLAY                                                                 APPELLEE

 

                                              ------------

 

             FROM THE 89TH
DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Union Square Federal Credit Union (AUnion
Square@) and
David Norris (collectively AAppellants@) appeal
from two judgments in favor of Appellee Richard R. Clay.  In five issues, they argue that the trial
court erred by (1) enjoining the enforcement of the underlying money judgments
rendered in their favor, (2) finding that the money judgments were dormant and
unrevivable, (3) finding that the abstracts of judgment obtained and the writs
of execution issued on the judgments were null and void, (4) finding that
Richard never abandoned his homestead claim to his residence at 4600 Trailwood,
Wichita Falls, Texas (ATrailwood@), and
(5) finding that property at 4409 Tobago Lane, Wichita Falls, Texas (ATobago@) was
the separate property or, alternatively, the sole management community property
of Richard=s wife Diane.  We affirm in part and reverse in part. We
affirm those portions of the trial court=s
judgments declaring that Trailwood is Richard=s
homestead, but we also reverse the remaining portions of the trial court=s
judgments, vacate those portions of the trial court=s
judgments permanently enjoining the enforcement of the underlying money
judgments, and render take-nothing judgments against Richard on all of his
claims for declaratory relief except his claim that Trailwood is his homestead.

                         Background
Facts and Procedural History








On July 13, 1989, Union Square filed a lawsuit
against Richard, alleging that he had defaulted on a credit agreement.  On March 13, 1990, it filed an amended
pleading that incorrectly listed Richard=s name
as ARichard
E. Clay@ instead
of ARichard
R. Clay.@  Richard filed an answer and did not object to
the change in the pleadings showing his name as ARichard
E. Clay.@  On July 2, 1990, the trial court rendered
judgment for Union Square, awarding damages of $24,533.86 plus interest, costs,
and attorney=s fees.

On August 14, 1990, Union Square asked the clerk
to issue a writ of execution on the judgment. 
The writ identified the judgment debtor as ARichard
E. Clay.@  On November 15, 1990, the sheriff returned
the writ nulla bona, that is, the sheriff found no seizable property belonging
to Richard E. Clay within the jurisdiction.[2]

On April 4, 2000, a few months short of ten years
after the judgment had been rendered, Union Square requested the clerk to issue
a second writ of execution.  The clerk
issued the writ on April 19, 2000, again identifying the judgment debtor as ARichard
E. Clay.@  The writ was received by the Wichita County
Sheriff=s office
on May 2, 2000, and returned nulla bona on May 19, 2000.








On February 16, 2001, Union Square sought a
judgment nunc pro tunc to correct the 1990 judgment to identify the judgment
debtor as ARichard R. Clay.@  The trial court rendered the judgment nunc
pro tunc on March 5, 2001.  The clerk
issued a writ of execution on the judgment nunc pro tunc and delivered it to
the sheriff=s office on April 9, 2001.

In an unrelated action, Norris filed suit against
Richard on December 22, 1989, alleging that Richard had defaulted on a note of
which Norris was the holder.  The
petition identified the defendant as ARick
Clay.@  Richard filed an answer but did not appear at
trial.  Norris obtained a default
judgment against Richard on April 3, 1990, with an award of damages of $3,750
plus interest, costs, and attorney=s
fees.  A writ of execution was prepared
by the clerk on March 31, 2000, and delivered to the sheriff=s office
on April 14, 2000, which returned it nulla bona on July 3, 2000.  On February 16, 2001, Norris sought a
judgment nunc pro tunc to correct the 1990 judgment to identify the judgment
debtor as ARichard R. Clay.@  The trial court rendered the judgment nunc
pro tunc.  The clerk issued a writ of
execution on the judgment nunc pro tunc on April 5, 2001 and delivered it to
the sheriff=s office on April 9, 2001.








After the writs on the two judgments nunc pro
tunc were delivered to the sheriff=s
office, the sheriff attempted to execute against Trailwood.  On June 1, 2001, Richard filed lawsuits
against Union Square and Norris seeking declaratory and injunctive relief from
the writs of execution on the 1990 money judgments held by them.  The trial court heard the cases
together.  Richard testified that his
name was Richard R. Clay but that he also went by ARick.@  He further testified that Trailwood was his
separate property and homestead, that he kept no bank accounts and paid all his
bills with cash, that Tobago was his wife=s
separate property, and that he would not have been able to finance its purchase
himself.  He also testified that he had
no ownership interest in five other properties held in his wife=s name.

On April 18, 2007, the trial court rendered
judgment granting the relief sought by Richard, finding that Richard never
abandoned his homestead claim to Trailwood and declaring that Trailwood is
Richard=s
homestead, that Tobago is the separate property or, alternatively, the sole
management community property of Richard=s wife
Diane, and that the 1990 money judgments obtained by Appellants are dormant and
cannot be revived.  The trial court
further ordered that Appellants Amay not
take any action in the future to attempt to collect or revive@ the
money judgments.  Appellants appealed.

                                               Analysis

Dormancy of the Judgments








In Appellants= second
issue, they argue that the trial court erred by finding that the money
judgments rendered in their favor were dormant and unrevivable.  In Appellants= third
issue, they argue that the trial court erred by finding that the abstracts of
judgment obtained and the writs of execution issued by Appellants on the money
judgments were null and void.  In their
first issue, Appellants contend that the trial court erred by enjoining the
enforcement of the money judgments. 
Appellants combine their arguments on these issues, and we will address
them together.

A judgment becomes dormant if no writ of
execution is issued within ten years after its rendition.[3]  If a writ is timely issued, another writ of
execution must be issued at some time within ten years after the prior writ or
the judgment will become dormant.[4]  If the judgment becomes dormant, no writ of
execution may be issued until the judgment has been revived by scire facias or
by an action of debt.[5]  An action to revive a dormant judgment may
not be brought after the second anniversary of the date that the judgment
became dormant.[6]








In the trial court, Richard contended that the
writs on the 1990 Union Square judgment were not properly issued because the
1990 writ of execution was defective in that his middle initial was not
properly placed in the execution and that no execution issued in 2000 because
Union Square instructed the sheriff to return the writ nulla bona.  He argued that no writ of execution issued on
the 1990 Norris judgment because the original writ that was issued stated the
name of the judgment debtor as ARick
Clay@ and
because it was not timely delivered to the sheriff.

If the writs of execution issued by Appellants
were null and void as alleged by Richard, then no writs were issued within ten
years of rendition of the money judgments, the judgments became dormant and
unrevivable, and the trial court did not err by enjoining their enforcement.[7]  Appellants had the burden at trial to prove
issuance of a valid writ within the statutory period.[8]

We first address the writs of execution
originally issued on the underlying money judgments and whether they were
fatally defective.  Appellants argue that
the minor irregularities in the form of the writs were immaterial.  We agree.








Rule 629 of the rules of civil procedure provides
that a writ of execution must contain the name of the party against whom
judgment was rendered.[9]  Not every element set out in rule 629 is
vital for the creation of a valid writ.[10]  But a writ is of no effect if it completely
omits the name of the judgment debtor or misidentifies the party against whom
judgment was rendered.[11]  Richard argued that under this requirement, a
writ of execution identifying him as ARichard
E. Clay@ or ARick
Clay@ is
void.  Although we have found cases
holding that a writ was void for failing to reflect the name of the debtor as
it appeared in the judgment, we have found no case voiding a writ of execution
on the ground that, although it reflected the name of the defendant as it
appeared in the judgment, it failed to state correctly the defendant=s legal
name.  Furthermore, courts have allowed
some deviation from the requirements for writs.[12]








We believe that the doctrine of misnomer applies
to this case.  Misnomer is when the
plaintiff sues but misnames the correct defendant.[13]  Under Texas law, a judgment is not rendered
void by the misnaming of a defendant, Aprovided
the intention to sue the correct defendant is evident from the pleadings and
process, such that the defendant could not have been misled.@[14]  If the defendant appears and does not object
to the misnomer, the judgment is binding on him as though he had been properly
named.[15]








In this case, Richard acknowledged that he filed
an answer in Union Square=s suit.  And although he signed his pleadings with his
correct initial and stated in interrogatories that his legal name was Richard
Robert Clay, he did not object that he had been misnamed.  The suit in that case was on a promissory
note that Richard admitted he had executed. 
Union Square=s intention to sue Richard was
obvious from the pleadings and process, and Richard was clearly not misled by
the misnomer.[16]  We also note that he did not file a plea in
abatement to correct the mistake or attack the money judgment on appeal.[17]

Similarly, although the judgment obtained by
Norris was against ARick Clay,@ Richard
was served and filed an answer in that case. 
Richard admitted at trial that he goes by the name ARick
Clay,@ and he
stated in interrogatories in Norris=s suit
against him that his name was ARichard
Robert Clay, a/k/a/ Rick Clay.@  He did not object that he had been misnamed,
and he admitted in the declaratory judgment trial that he had executed the note
on which Norris sued.  Norris=s
intention to sue Richard was clear from the pleadings and process, and Richard
was not misled by the misnomer.  Thus,
the 1990 money judgments obtained against Richard by Appellants were valid
judgments.[18]













Because a writ of execution on these judgments
had to conform to the defendant as named in the judgments,[19]
and the judgments were valid despite the misnomers,[20]
it stands to reason that the writs of execution issued on those judgments must
also have been valid despite the misnomers. 
We find applicable the reasoning applied by the Supreme Court of Texas in
Abilene Independent Telephone and Telegraph Co. v. Williams.[21]  In that case, the court decided whether a
defendant may enjoin the enforcement of a default judgment when the defendant
is misnamed in the petition, citation, and judgment.  An employee sued his employer, Abilene
Independent Telephone & Telegraph Company, for injuries sustained on the
job.[22]  His petition misnamed his employer as Abilene
Independent Telephone Company.[23]  The citation issued named the defendant as
Abilene Telephone Company.  The citation
was returned as served on Abilene Independent Telephone Company.[24]  An attorney for Abilene Independent Telephone
& Telegraph Company declined to appear on behalf of the company but, as a
friend of the court, exhibited a charter showing the company=s
correct name.[25]  The trial court rendered a default judgment
for the employee, and execution was ordered to issue against Abilene
Independent Telephone Company.  Thus,
neither the petition, citation, judgment, or writ of execution correctly named
the company, but there was no doubt as to the true identity of the party being
sued.[26]  The company then brought suit to enjoin the
execution.[27]  Although the ground presented by the company
for the injunction was that no judgment had been rendered against it by its
true corporate name, and not that the writ of execution did not correctly name
it, the court=s analysis is instructive to the
case here.








The court first noted that under the facts of the
case, where the true identity of the defendant was not in question, the
defendant was obliged to appear and answer or face default judgment.[28]  The court stated that if a party knows that
suit has been brought against it but fails to appear and object to the mistake
in its name, Ait ought to be treated as having
waived the mistake.@[29]  Thus, under the court=s
holding, because Richard did not object in the trial court that he had been
misidentified when Appellants originally sued him, we must treat him as having
waived the mistake in his name.[30]

The court also noted that the judgment was being
attacked, not on direct appeal, but collaterally in an injunction action.  It stated that A[n]umberless
errors entitle a party to a reversal of a judgment on appeal [but] are of no
avail when relied on to support a collateral attack on the judgment or to
furnish a basis for equitable relief against the enforcement of the judgment.@[31]  The court went on to state that the judgment
was not void and that A[u]nder thoroughly settled
principles, equitable relief against the enforcement of the judgment must be
denied.@[32]  Although the supreme court decided Abilene
over eighty years ago, the holding in that case has not been overruled.













The principles set out in Abilene apply
here.  Like the judgment debtor in Abilene,
Richard made a collateral attack on the judgments and sought equitable relief
from them in the form of an injunction.[33]  As in Abilene, there is no doubt that
Richard was the defendant in both judgments. 
Although he stated his correct name in both cases in responses to
interrogatories, he never objected to the misnomer in either case.  Thus, he should be treated as having waived
the mistake, and he cannot now argue that the enforcement of the judgments
should be enjoined based on the mistake.[34]  And although he states his ground for relief
as a misidentification in the writs of execution rather than in the judgments,
the same reasoning should apply.[35]  We note that Richard did not object in the
trial court when the money judgments were rendered,[36]
did not ask for post-trial correction of the judgments to reflect his legal
name,[37]
and did not attack the previous writs for failing to use his legal name.[38]  Instead, he waited to attack the writs until
the time when the judgments would be dormant if no writ of execution had issued
on them.  Because Richard allowed
Appellants to be placed in a worse situation than if he had made a prompt
complaint, he should not be heard to complain now.[39]








Furthermore, in Union Square=s suit,
it named Richard using a correct Christian name but an incorrect middle
initial.  Under the common law, a middle
initial was held to be of no importance.[40]  Although cases have suggested that the common
law may no longer be applicable,[41]
we have found no case expressly abrogating it.[42]  With respect to Norris=s suit,
the name ARick@ is a
common diminutive of ARichard.@[43]  A common diminutive of a name is sufficient
to identify a person,[44]
and here, not only is Rick a common diminutive of Richard,  but the Richard involved in this suit is
known by that name and has entered into at least one agreement using it.  Thus, under the facts presented here, neither
the incorrect middle initial nor the use of a diminutive made the writs void.








While this court declines to create a general
rule as to when a writ that misnames the judgment debtor is nonetheless valid
and enforceable, we hold that in this limited factual situationCwhen
there was no doubt as to the true identity of the party, the party failed to
object at trial or to the judgments nunc pro tunc to correct the misnomer, and
where the misnomers are merely the use of an incorrect middle initial and the
use of a diminutive by which the party acknowledged he is knownCthe
writs were valid.  The trial court
therefore erred by declaring that the writs of execution were null and void.













Richard argued in the trial court that even if
the 1990 writ issued on Union Square=s money
judgment was valid, the judgment nonetheless became dormant because in 2000,
when another writ of execution was required to maintain the judgment, Union
Square instructed the sheriff to return the writ Anulla
bona@ and
therefore no writ was issued.  On April
4, 2000, Union Square=s attorney sent a letter to the
district clerk stating, APlease issue a Writ of Execution
and advise the Sheriff that he may return it Nulla Bona in 30 days.@  Rule 629 states that a writ Ashall
require the officer to return it within thirty, sixty, or ninety days, as
directed by the plaintiff or his attorney.@[45]  Union Square directed the sheriff that if
after thirty days, no property could be found to levy upon, the sheriff could
return it nulla bona at that time.  Union
Square did not instruct the sheriff not to attempt to levy on Richard=s
property;[46]
it merely instructed the sheriff to return the writ after thirty days, rather
than continue to look for property for sixty or ninety days.  Richard argued in the trial court that
because of the instruction to the sheriff, the sheriff did not attempt to serve
the writ.  There was no evidence about
the motivation of the sheriff in not serving the writ on Richard; although Richard
testified that no one attempted to serve the writ on him, he also testified
that no one attempted to serve the 1990 writ either.  The writ as prepared by the clerk instructs
the sheriff to return the writ in thirty days and does not instruct him to hold
it and to return it nulla bona without attempting to levy on Richard=s
property.  There was no evidence that the
sheriff ever saw the letter from the attorney. 
Further, the sheriff=s return
stated that it was returned nulla bona, A[n]o
property found in Wichita County belonging to Defendant subject to Execution.@  Thus, on the face of the return, the sheriff
did look for Richard=s property.  We reject Richard=s
argument that Union Square=s
attorney=s letter
to the clerk prevented the writ from issuing. Thus, we hold that the writ of
execution was validly issued and served to keep Union Square=s money
judgment from becoming dormant, and the trial court erred by declaring that the
judgment was dormant and that the abstracts of judgment against Richard based
on the judgment were null and void.

Richard also argued that the writ of execution on
the money judgment obtained by Norris was not issued within the ten-year time
period of section 34.001 and thus the judgment became dormant because, although
the clerk prepared the writ before the ten-year time period had run, the writ
was not delivered to the sheriff for enforcement until after the time period
had run.  On appeal, Appellants argued
that the issuance of the 2000 writ on Norris=s
judgment was timely, given that only fourteen days elapsed between the clerk=s
preparation of the writ and delivery to the sheriff for enforcement.








Although section 31.004 does not define Aissue,@ courts
have long held that issuance of a writ requires more than preparation of the
writ by the clerkCthe writ must also be delivered
to an officer for enforcement.[47]  In determining the effect of preparation of
the writ before the statutory period but delivery after the statutory period,
some courts have relied on the law governing statutes of limitations and
service of citation.[48]  If a suit is filed before the end of the
limitations period but the defendant is not served until after the limitations
period has run, and the defendant asserts the defense of limitations, the
plaintiff must show that he exercised reasonable diligence in having the defendant
served.[49]  The relevant inquiry in assessing the
plaintiff=s diligence is Awhether
the plaintiff acted as an ordinarily prudent person would have acted under the
same or similar circumstances and was diligent up until the time the defendant
was served.@[50]  If diligence is shown, then the date of
service relates back to the date the petition was filed.[51]  Relying on that body of law, some courts have
held that if a writ of execution is clerically prepared before the ten years in
section 34.001 ends but not delivered to an officer for enforcement until after
the period ends, the judgment creditor must show reasonable diligence in having
the writ delivered to the sheriff.[52]








In this case, the money judgment obtained by
Norris was signed on April 3, 1990.  The
writ was clerically prepared by the clerk on Friday, March 31, 2000Cwithin
the statutory periodCand delivered to the sheriff on
Friday, April 14, 2000Coutside the statutory
period.  Norris offered no explanation in
the record for the delay in delivery of the writ to the sheriff.








With respect to service of citation, some courts
(including this one) have held that when no explanation for the delay is given,
the delay shows a lack of diligence as a matter of law.[53]  Such cases generally involve a delay of months
or years.[54]  But two courts have held that Aa
showing of speedy service of citation, without any unexplained lapses of
time, may establish diligence as a matter of law.@[55]  In Harrell, the El Paso Court of
Appeals held that the plaintiff did not have to show evidence of diligence in
serving the defendants after the statute of limitations had passed because a
clerk Amust be
given a reasonable time to fulfill her obligations@ to
issue and deliver citations, and Aa party
may ordinarily rely on the clerk to perform that duty within a reasonable time.@[56]  The three weeks it took the clerk to issue
and serve citation Adid not entail any inaction by
the clerk obligating . . . recognition and correction@ by the
plaintiff in the case and therefore that period of time did not Ainclude
any unexplained lapses in diligence.@[57]  The Dallas Court of Appeals similarly has
held that two weeks was a reasonable amount of time to allow the clerk to
perform his duties and that the plaintiff was not required to do anything
within that time to ensure that the clerk delivered the citations.[58]








Here, we have a delay of two weeks.  We find compelling the reasoning of the El
Paso and Dallas Courts of Appeals and hold that it should apply to the issuance
of writs of execution.  The record is not
clear whether, after preparing the writ, the clerk delivered it to the sheriff
or Norris=s attorney.[59]  But even assuming the clerk delivered the
writ to Norris=s attorney, rather than
delivering the writ directly to the sheriff for enforcement, some time must be
allowed for the clerk to notify Norris=s
attorney that the writ has been prepared, for Norris=s
attorney to go to the clerk=s office
and pick up the writ or for the clerk to deliver the writ to Norris=s
attorney, and for Norris=s attorney to deliver the writ
to the sheriff.  We decline to set out a
general rule for how long a clerk must be allowed to prepare a writ, or how
much time after preparation of a writ must be allowed to deliver it to an
officer for enforcement, but we hold that two weeks shows reasonable
diligence.  Thus, Norris was not required
to give any explanation in the trial court for the delay, and the date of
delivery relates back to the date of preparation of the writ.[60]  We hold that the writ of execution on Norris=s 1990
money judgment was therefore timely issued and prevented the judgment from
becoming dormant, and, consequently, the trial court erred by declaring that
the Norris judgment became dormant and that any abstract of judgment based on
the judgment was null and void.













Having held that the 1990 money judgments did not
become dormant, we now consider whether the trial court had the authority to
change Richard=s name on the judgments by
judgment nunc pro tunc.  Richard argued
to the trial court in his declaratory judgment action that the judgments nunc
pro tunc changed the defendant and therefore constituted a correction of a
judicial error and not a clerical error. 
The trial court=s judgments on Richard=s
declaratory judgment actions made no finding about whether Richard=s name
could validly be corrected in a judgment nunc pro tunc and said only that the
judgments nunc pro tunc were invalid because they were rendered when the
underlying money judgments were dormant. 
We have held that the underlying money judgments were not dormant.  Furthermore, there is no question that
Richard was the correct defendant in both of the underlying suits.  The types of misnomers at issue here
constitute clerical errors that may be corrected by judgment nunc pro tunc.[61]  Thus, the trial court properly entered the
judgments nunc pro tunc.[62]  And, accordingly, the writs of execution
issued on those judgments were valid. 
Because we hold that the trial court erred by declaring that the money
judgments against Richard were dormant and incapable of being revived, we
sustain Appellants= second issue.  Because the judgments were not dormant, we
further hold that the trial court abused its discretion by enjoining the
enforcement of the judgments.[63]  Accordingly, we sustain Appellants= first
issue.  Because we hold that the
abstracts of judgment and writs of execution issued by Appellants were valid,
we sustain Appellants= third issue.

Homestead Claim to Trailwood








In Appellants= fourth
issue, they argue that the trial court erred by finding that Richard never
abandoned his homestead claim to Trailwood.[64]  Appellants do not specify whether they
challenge the trial court=s finding for legal sufficiency
or for factual sufficiency, but because they ask this court to render judgment
on the issue, we will review the finding for legal sufficiency.[65]  We therefore determine whether Appellants
established as a matter of law that Richard abandoned Trailwood as his
homestead.[66]  Appellants concede that Richard proved that
Trailwood had been his homestead at one time, but they argue that Richard
abandoned his homestead rights in the property.

Once a party proves the existence of homestead
rights in property, those rights are presumed to continue until abandoned or
until a new homestead is acquired.[67]  A party asserting abandonment of a homestead
has the burden of proving it.[68]  Thus, once Richard established that Trailwood
was his homestead, Appellants had to prove that Richard had abandoned that
property as his homestead.








To show abandonment of a homestead, a party must
prove cessation of use of the property as a homestead coupled with an intention
not to return.[69]  A person may not have two homesteads, and the
establishment of a new homestead constitutes abandonment of the previous
homestead.[70]  But merely acquiring and moving to a new Ahome@ does
not necessarily establish the acquisition of a new Ahomestead.@[71]  The evidence demonstrating abandonment Amust be
undeniably clear and beyond almost the shadow, at least of all reasonable
ground of dispute, that there has been a total abandonment with an intention
not to return and claim the exemption.@[72]








Appellants contend that the evidence supported
the conclusion that Richard and his family moved to Tobago with the intent to Atrade up@ their
home and that Richard only Aremembered@ his
intent to return to Trailwood when it became clear he could lose the property
to his creditors.  They further contend
that Richard=s testimony that he intended to
return to Trailwood was insufficient because he did not testify when he would
return or what circumstances would lead him to return.  Appellants cite no law for the proposition
that Richard was required to put on evidence of any definite plan to return to
the property to defeat an assertion of abandonment.[73]  Richard did not have to put on evidence of
any kind that he intended to return to the property; rather, Appellants had to
prove that he discontinued use of Trailwood with the intent to permanently do
so.[74]













As evidence that Richard abandoned his homestead
at Trailwood, Appellants note that in 2001, Richard and his wife bought another
home (Tobago) and that they had not lived at Trailwood for four years.[75]  Appellants also point out that the county
taxing authority terminated Richard=s
homestead property tax exemption on Trailwood after he failed to spend a night
on the property during 2003, and they argue that Richard=s
failure to take any action to reinstate the exemption indicates in a clear
manner his intent not to return to the property.  The Clays both acknowledged that they had not
spent a night on the property since moving to Tobago.  Diane testified that her driver=s
license lists the Tobago address.[76]  In addition, Appellants introduced a deed of
trust that the Clays had executed on Trailwood as part of the transaction for
the loan they obtained to purchase the house on Tobago, and if Trailwood was
their homestead, then the Clays obtained a loan from a bank in part by signing
a void deed of trust.[77]  The president of the bank through which the
Clays financed the purchase of Tobago testified that it was his understanding
that the Clays purchased Tobago to be their homestead, although he also
testified that he understood that Diane was purchasing Tobago as her separate
property and that no one told him that she was abandoning her homestead at
Trailwood when she did so.








Evidence in support of the trial court=s
finding included the testimony of both Diane and Richard that they considered
Trailwood to be their homestead.  Diane
testified that the utilities are still connected to Trailwood, they still
maintain the property, and they still have furniture at the property.  The Clays have not rented[78]
or sold[79]
Trailwood, and they have not claimed any other property as their
homestead.  Thus, there was evidence before
the trial court that the Clays did not acquire Tobago with a definite intent
not to return to Trailwood.[80]  That the Clays allowed their tax exemption on
Trailwood to lapse may be evidence of intent not to return but it is not
dispositive,[81]
especially considering that a tax exemption for a person=s
homestead is generally only available if the property is the person=s
principal residence.[82]  Thus, if the Clays=
principal residence was Tobago, but they lacked an intent not to return to
Trailwood, the Clays could lose their homestead tax exemption for Trailwood
without losing constitutional homestead protection from creditors.[83]








With respect to the deed of trust on Trailwood,
Richard testified that he executed the deed of trust because the bank asked
them to and that the bank had been informed that Diane was buying Tobago with
funds from her inheritance.  The bank
president testified that it was normal bank practice when a party is abandoning
one homestead and acquiring another with a bank loan, which he understood was
Diane=s
intention, and the former homestead had not yet been sold.  Thus, there was apparently some confusion at
the bank as to whether Trailwood would be sold, and this court does not have to
conclude either that the Clays evidenced a desire to abandon their homestead at
Trailwood by signing the deed of trust or that they induced the bank to give
them a loan by executing a void security instrument.[84]

 In light
of the record before us, because Appellants failed to produce legally
sufficient evidence that the Clays had abandoned their homestead at Trailwood
with an intention not to return to it, the trial court did not err by failing
to find abandonment.[85]  We overrule Appellant=s fourth
issue.

Characterization of Tobago 








In Appellants= fifth
issue, they argue that the evidence was legally insufficient to support the
trial court=s finding that Tobago is the
separate property or, alternatively, the sole management community property of
Richard=s wife
Diane.  In Appellants= prayer
for relief on appeal, they ask this court to determine that each of the other
properties purchased by Richard and Diane are also subject to execution to
satisfy the underlying judgments against Richard.  At trial, Richard testified that the
president of the bank that financed the purchase of Tobago had told Diane that Ashe
could have all the real estate she wanted if she would pay 10 percent down@ and
that consequently, Richard and Diane had executed notes and deeds of trust to
finance the purchase of five additional properties.  Because the trial court=s
judgments made no findings as to these other properties, we will not address
them.

Property acquired during marriage is presumed to
be community property.[86]  This presumption may be rebutted, however, by
clear and convincing evidence.[87]  Appellants challenge the legal sufficiency of
the trial court=s finding that Richard rebutted
this presumption as to Tobago.








Because the burden of proof at trial was clear
and convincing evidence, on appeal we apply a higher standard of legal
sufficiency review than is ordinarily employed in civil cases.[88]  In reviewing the evidence for legal
sufficiency under the clear and convincing standard, we must determine whether
the evidence is such that a factfinder could reasonably form a firm belief or
conviction that its finding was true.[89]  We must review all the evidence in the light
most favorable to the finding.[90]  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.[91]  We must also disregard all evidence that a
reasonable factfinder could have disbelieved.[92]  We must consider, however, undisputed
evidence even if it is contrary to the finding.[93]  That is, we must consider evidence favorable
to the finding if a reasonable factfinder could and disregard evidence contrary
to the finding unless a reasonable factfinder could not.[94]








Property purchased during marriage on the credit
of the community is community property unless there is an express agreement
from the lender to look only to the separate property of the purchasing spouse
for satisfaction of the debt.[95]  The intention of the spouses is not
controlling in the absence of such an agreement.[96]








Although Diane had inherited several hundred
thousand dollars from her mother, she did not use these funds to purchase
Tobago.  Instead, Richard approached a
bank about financing the purchase through a loan.  It was undisputed that both Richard and Diane
signed the note by which they acquired the funds used to purchase Tobago.[97]  Although Richard testified that he assumed
that he was just a Aco-maker,@ that
is, that he would only be obligated on the loan if Diane did not pay, the note
itself was not introduced into evidence. 
The deed of trust on Tobago stated that the maker of the note was ADiane T.
Clay and husband, Richard R. Clay.@  Thus, Tobago was acquired on community
credit.








The bank took as security an assignment of a
certificate of deposit at the bank that was in Diane=s name,
but it also took a security interest in Tobago, the deed for which listed both
Richard and Diane as grantees.  Although
the bank president testified that the Clays had requested the loan be made to
Diane and that he understood that Diane wished to acquire the property as her
separate property, the deed as executed listed both Richard and Diane, and both
Richard and Diane signed the note. 
Although the bank president testified that the Clays had requested the
loan to be in Diane=s name alone, Awhich
was fine considering that she was putting up the additional collateral@ of the
certificate of deposit, under the loan documents as actually executedCand not
corrected or amended by the time of trialCthere
was not clear and convincing evidence that the bank expressly agreed to look solely
to Diane=s
separate property to satisfy the loan. 
And in March 2001, at the bank=s
request, Diane and Richard executed a deed of trust on Trailwood to secure the
note, and Richard testified that they did so at the bank=s
request, which belies an agreement that the bank had expressly agreed to limit
itself to Diane=s separate property for
satisfaction of the debt.  Thus, because
a factfinder could not reasonably form a firm belief or conviction that the
bank expressly agreed to look solely to Diane=s
separate property, the evidence was not legally sufficient to support the trial
court=s
finding that Tobago is Diane=s
separate property.[98]








Appellants further argue that the evidence was not
legally sufficient to support the trial court=s
alternative finding that Tobago was Diane=s sole
management community property.  Community
property is generally subject to the joint management of the spouses unless
they provide otherwise by agreement.[99]  But community property is not subject to
joint management if one spouse has sole management, control, and disposition of
the property.[100]  A spouse has sole management, control, and
disposition over property that the spouse would have owned if single.[101]  Property is presumed to be one spouse=s sole
management community property if it is held in that spouse=s name
alone Aas shown
by muniment, contract, deposit of funds, or other evidence of ownership.@[102]  If property is the sole management community
property of one spouse, it is not subject to the nontortious liability of the
other spouse.[103]








When property is transferred, title to the
property vests upon execution and delivery of the deed.[104]  In this case, although both Richard and Diane
testified that Diane owned Tobago, the deed actually named both Richard and
Diane as grantees.  Thus, title to the
property vested in them both.[105]  The evidence was also undisputed that both
Clays signed the note and the deed of trust relating to the transaction.  That both Clays were listed as grantees on
the deeds and both Clays signed the deed of trust and the note is sufficient to
establish that Tobago when acquired was subject to the Clays= joint
management.[106]








Richard argued to the trial court that no person
can be made a grantee without his acceptance of the deed and that he did not
accept delivery.  Richard is correct that
a grantee must accept the deed in order for the deed to convey an interest in
the property to him.[107]  But the recording of a deed creates a rebuttable
presumption that the grantee accepted the deed.[108]  The deed from the grantors to Richard and
Diane was recorded, which created a presumption that Richard accepted the
deed.  There is no evidence in the record
that after the Clays acquired Tobago, Richard said anything or took any action
prior to filing suit that was inconsistent with an ownership interest in
Tobago.  Although Richard and Diane
testified that it had not been their intention in setting up the transaction
for Richard to have an ownership interest in the property, that is not evidence
that he did not actually accept the deed. 
Thus, Richard did not rebut the presumption of acceptance.  The trial court therefore should have
presumed that Richard accepted the deed and that the deed therefore vested an
interest in the property in Richard.  The
property was therefore joint management community property absent evidence from
Richard to the contrary.  Furthermore,
once title vested in Richard, a subsequent deed from the same grantors to Diane
could not thereby divest Richard of his title to the property.[109]  Assuming that a spouse may rely on section
3.104 to protect property from the other spouse's creditors,[110]
Richard is not entitled to the presumption in this case.  Thus, unless the evidence established that
Richard and Diane agreed that Tobago would be under Diane=s sole
management, then Tobago was subject to their joint management.[111]


















We therefore look to the record to determine if
the Clays produced more than a scintilla of evidence that they entered into an
agreement that the property would nevertheless be Diane=s sole
management community property.[112]  Although there was testimony that the parties
had originally planned that Diane would acquire Tobago as her separate
property, there was no testimony or other evidence admitted to show that Diane
and Richard had entered into an agreement that the property, once acquired as
community property, would be under Diane=s sole
management.[113]  Furthermore, any circumstantial evidence that
could support such an agreement was no more than a scintilla.  Richard testified that the note from the bank
was for a bridge loan that became due at the end of one year, that the note was
paid off, and that Aat the end of the year they went
to a balloon note,@ but he does not state who Athey@ is, and
thus it was not clear that Diane is the only one obligated on the new
note.  Diane testified that Richard pays
some of their bills, but she could not recall which ones, and there was no
testimony that Richard does not pay for any of the household bills relating to
Tobago.  Rather than having no
involvement with Tobago, both Richard and Diane live at Tobago with their
children, and there was no evidence that Richard did not participate in
decision-making with respect to Tobago.[114]  No action was taken to put the property in
Diane=s name
alone until after the Clays commenced this litigation.  And in fact, in March 2001, Richard and Diane
executed a new deed of trust on Trailwood to secure the note on Tobago.  Richard testified that when he was served
with the writs of execution and he was asked by the constable which house he
wanted to sell, he told the person serving him, Apick you
one,@ that
his homestead was Trailwood, Abut, you
know, sell whichever one you want.@  He did not tell the officer that Tobago was
not his property or was not subject to execution for his debts.  That the grantors executed another deed to
Tobago in Diane=s name alone after Richard filed
suit is evidence Diane attempted to convert the property into her separate
property, but it is not evidence of an agreement that the property would be
community property subject to Diane=s sole
management.[115]

Because Richard did not produce more than a
scintilla of evidence that he and Diane entered into an agreement that Tobago
would be under Diane=s sole management, the evidence
was legally insufficient to support the trial court=s
finding.  Because the trial court erred
by finding that Tobago was Diane=s
separate property or sole management community property, it also erred by
declaring that Tobago is not subject to execution for payment of Richard=s
debts.  We sustain Appellants= fifth
issue.

                                             Conclusion








We affirm the trial court=s
judgments in part and reverse the trial court=s
judgments in part.  Having overruled
Appellants= fourth issue, we affirm those
portions of the trial court=s
judgments declaring that Trailwood is Richard=s
homestead.  Having sustained Appellants= first,
second, third, and fifth issues, we reverse the remaining portions of the trial
court=s
judgments, vacate those portions of the trial court=s
judgments permanently enjoining the enforcement of the underlying money
judgments, and render take-nothing judgments against Richard on all of his
claims for declaratory relief except his claim that Trailwood is his homestead.

 

 

LEE
ANN DAUPHINOT

JUSTICE

PANEL:  CAYCE, C.J.; DAUPHINOT
and MCCOY, JJ.

DELIVERED: April 23, 2009











[1]See Tex. R. App. P. 47.4.





[2]See Black=s Law Dictionary 1098
(8th ed. 2004) (defining Anulla bona@ as a notation made by a
sheriff on a return when no seizable property belonging to the judgment debtor
was found within the jurisdiction).





[3]Tex. Civ. Prac. &
Rem. Code Ann. ' 34.001(a) (Vernon 2008).






[4]Id. ' 34.001(b).





[5]Id. '' 31.006, 34.001(a).





[6]Id. ' 31.006.





[7]See id. '' 31.006, 34.001(a).





[8]See Ross v. Am. Radiator
& Standard Sanitary Corp., 507 S.W.2d 806, 809B10 (Tex. Civ. App.CDallas 1974, writ ref=d n.r.e.).





[9]Tex. R. Civ. P. 629.





[10]Collins v. Hines, 100 Tex. 304, 99 S.W.
400, 402 (1907).





[11]Id. (stating that it is Aessential@ that writ of execution
state Aagainst whom it is to
operate@ because A[w]ithout the command to
take the property of a named person, the official has no authority to take that
of any one@); Battle v. Guedry,
58 Tex. 111, 1882 WL 9585, at *2B3 (1882) (holding that judgment against J. P.
Clements would not support writ of execution reciting judgment against P. B.
Clements when evidence did not show the two judgments were one and the same).





[12]See Houston Oil Co. of
Tex. v. Randolph, 251 S.W. 794, 797 (Tex. Comm=n App. 1923, judgm=t adopted) (noting that Awhere there exists a
valid judgment, a writ of execution[,] though defective and irregular in
failing to comply with some of the statutory requirements with reference to the
form of the writ, is only voidable@ and citing to cases upholding writs that failed
to comply with some of the statutory requirements for the form of the writ); see
also Irvin v. Ferguson, 83 Tex. 491, 18 S.W. 820, 821 (1892)
(addressing writ that described trial court judgment rather than supreme court
judgment and omitted name of plaintiffs and holding that A[w]e are not prepared to
hold that any of the irregularities referred to would, under the execution and
sale, render it void@).





[13]Enserch Corp. v. Parker, 794 S.W.2d 2, 4 (Tex.
1990); Torres v. Johnson, 91 S.W.3d 905, 908 (Tex. App.CFort Worth 2002, no
pet.).





[14]Brown v. Lanier
Worldwide, Inc., 124 S.W.3d 883, 895 (Tex. App.CHouston [14th Dist.] 2004, no pet.); see also
Abilene Indep. Tel. & Tel. Co. v. Williams, 111 Tex. 102, 229 S.W.
847, 848 (1921) (stating that  misnomer
that is not misleading Amerely entitles the
defendant to abate the proceeding until the misnomer be corrected@).





[15]Abilene, 229 S.W. at 848; see
also Brown, 124 S.W.3d at 895.





[16]See Brown, 124 S.W.3d
at 897 (noting that defendant was not misled by the misnomer in that case).





[17]Abilene, 229 S.W. at 848 (noting
that the misnomer of a defendant Amerely entitles the defendant to abate the
proceeding until the misnomer be corrected@).





[18]See Brown, 124 S.W.3d at 895.





[19]See Tex. R. Civ. P. 629;
Battle, 1882 WL 9585, at *2B3.





[20]See Abilene, 229 S.W. at 848.





[21]Id. at 849.





[22]Id. at 847.





[23]Id.





[24]Id. at 848.





[25]Id.





[26]Id. at 847B48.





[27]Id. at 847.





[28]Id. at 848.





[29]Id.





[30]See id.





[31]Id. at 848 (emphasis added).





[32]Id. at 849.





[33]See In re City of Dallas, 977 S.W.2d 798, 804
(Tex. App.CFort Worth 1998, no pet.)
(noting that injunction is equitable relief).





[34]Abilene, 229 S.W. at 848B49.





[35]See Williams v. Ball, 52 Tex. 603, 1879 WL
7761, at *5 (1879) (citing Freeman on Executions for the proposition that A[w]hen an execution is
not in proper form . . . the defendant . . . ought not to be heard when . . .
he has allowed plaintiff to be placed in a worse situation than though prompt
complaint had been made@ and that A[w]hen sufficient [sic]
appeared on the face of the execution to connect it with the judgment, courts
have frequently disregarded variances in the names of the parties@).





[36]See Abilene, 229 S.W. at 848.





[37]See Carlyle Real Estate
Ltd. P=ship‑X v. Leibman, 782 S.W.2d 230, 233
(Tex. App.CHouston [1st Dist.] 1989,
no writ) (holding that trial court did not err by rendering judgment nunc pro tunc
to accurately reflect legal name of party against whom judgment was rendered).





[38]See Ayres v. Duprey, 27 Tex. 593, 1864 WL
2724, at *9 (1864) (noting that law was @abundantly settled . . . that the question of
irregularity or error in the execution, or the proceeding under it by the
sheriff, can never be discussed collaterally in another suit@).





[39]See Williams, 1879 WL 7761, at *5.





[40]See Mullins v. Albertson, 136 S.W.2d 263, 264
(Tex. Civ. App.CSan Antonio 1940, writ
ref=d) (noting that judgment
at issue named defendant as G. W. Albertson, that abstract of judgment also
named the defendant as G. W. Albertson, and that there was no question that G.
M. Albertson and G. W. Albertson were one and the same person and holding that
the abstract of judgment naming G. W. Albertson created a lien against land
belonging to G. M. Albertson); Gilles v. Miners= Bank of Cartersville,
Mo., 198
S.W. 170, 171 (Tex. Civ. App.CAmarillo 1917, writ ref=d) (op. on reh=g) (stating that under
common law middle initials Awere never taken notice of@ and that it was of no
concern whether that rule still applied when question was raised for first time
on appeal because Aa misnomer can be taken
advantage of only by plea in abatement@).





[41]See Wicker v. Jenkins,
49 Tex. Civ. App. 366, 108 S.W. 188, 190 (Tex. Civ. App.CTexarkana 1908, no writ)
(noting that common law rule disregarding middle initial, or middle name, of a
party to an instrument had Alost much of the reason upon which it was
originally based@ and holding that
abstract of judgment identifying plaintiff as W. AB. F.@ Wicker instead of W. AF. B.@ Wicker did not create a
lien on the defendant=s property).  But see Gilles, 198 S.W. at 171.





[42]See Mullins, 136 S.W.2d at 264
(holding that abstract of judgment naming G. W. Albertson created a lien
against land belonging to G. M. Albertson).





[43]See, e.g., U.S. v. Vallee,
No. 08‑01987‑CR, 2008 WL 5411079, at *1 (2d Cir. Dec. 30, 2008)
(styling the case AUnited States of America
v. Richard Vallee, also known as >Rick=@); U.S. v. Clonce, 186 Fed. Appx. 464,
2006 WL 1738221, at *1 (5th Cir. 2006) (naming defendant as ARichard Lee Clonce, also
known as Rick Clonce@); Szkatulski v.
Thruway Inn, Inc., 836 N.Y.S.2d 463, 463 (N.Y. App. Div. 2007) (naming one
respondent as ARichard Osborne, also
known as Rick Osborne@).





[44]O=Brien v. Cole, 532 S.W.2d 151, 152B53 (Tex. Civ. App.CDallas 1976, no writ)
(noting that Apurpose of describing a
person by name is to identify him@ and that A[a] commonly‑known diminutive or
abbreviation is sufficient to identify a person in the absence of evidence
indicating that a different person is intended@ and holding that use of
the name ATerry@ in an invoice was
sufficient to identify ATerrance@ as alleged in petition).





[45]Tex. R. Civ. P. 629.





[46]See Carpenter v. Probst,
247 S.W.2d 460, 461 (Tex. Civ. App.CSan Antonio 1952, writ ref=d) (holding that when no
showing was made that officer Awas in any way thwarted or deterred from
performing his duty,@ writ issued when
delivered to officer); cf. Harrison v. Orr, 296 S.W. 871, 875B76 (Tex. Comm=n App. 1927, judgm=t adopted) (holding no Aissuance@ of writ when, upon
clerical preparation of the writ, sheriff was instructed to hold the writ until
a certain date and then return it).





[47]Parlin & Orendorff
Implement Co. v. Chadwick, 4 S.W.2d 133, 135 (Tex. Civ. App.CFort Worth 1928, no writ).





[48]Ross, 507 S.W.2d at 809B10; Williams v. Short,
730 S.W.2d 98, 99B100 (Tex. App.CHouston [14th Dist.]
1987, writ ref=d n.r.e.). 





[49]Ross, 507 S.W.2d at 809.





[50]Proulx v. Wells, 235 S.W.3d 213, 216
(Tex. 2007).





[51]See Tarrant County v.
Vandigriff,
71 S.W.3d 921, 924 (Tex. App.CFort Worth 2002, pet. denied).





[52]See Rollins v. Am.
Express Travel Related Servs. Co., 219 S.W.3d 1, 4 (Tex. App.CHouston [1st Dist.] 2006,
no pet.); Williams, 730 S.W.2d at 100; Ross, 507 S.W.2d at 809.





[53]See Vandigriff, 71 S.W.3d at 925 (AWhether a plaintiff was
diligent in effecting service is normally a question of fact, but if no excuse
is offered for a delay . . . lack of diligence will be found as a matter of
law.@).





[54]See, e.g., Gant v. DeLeon,
786 S.W.2d 259, 260 (Tex. 1990) (delay of three periods totaling thirty-eight
months); Vandigriff, 71 S.W.3d at 926 (twenty‑eight‑month
delay); Ross, 507 S.W.2d at 809B10 (delay of over two months).





[55]Harrell v. Alvarez, 46 S.W.3d 483, 486
(Tex. App.CEl Paso 2001, no pet.)
(holding that three weeks is not an unreasonable amount of time to allow a
clerk to perform her duties) (emphasis added).





[56]Id.





[57]Id.





[58]Boyattia v. Hinojosa, 18 S.W.3d 729, 734
(Tex. App.CDallas 2000, pet. denied)
(ATwo weeks is not an
unreasonable amount of time to allow a clerk to perform his duties under the
rule.  Accordingly, there was no inaction
by the clerk that Boyattia was obligated to recognize and act upon to correct.@).





[59]See Bourn v. Robinson, 107 S.W. 873, 875 (Tex.
Civ. App.CTexarkana 1908, no writ)
(noting that law did not require clerk to deliver writ to officer for
enforcement and that clerk may have delivered writ into hands of plaintiff or
his attorney).





[60]See Harrell, 46 S.W.3d at 486. 





[61]See Masterson v. Young, 48 S.W. 1109, 1110
(Tex. Civ. App.CAustin 1899, writ ref=d) (noting that a mistake
as to a person=s middle initial Adoes not, ordinarily,
affect the rights of the parties@); see also Kollman Stone Indus., Inc. v.
Keller, 574 S.W.2d 249, 250 n.2 (Tex. Civ. App.CBeaumont 1978, no writ)
(noting that courts have held that Aentry of a nunc pro tunc judgment is a proper
method of correcting an error in the initials of the defendant@); Goodyear Tire &
Rubber Co. v. Pearcy, 80 S.W.2d 1096, 1097 (Tex. Civ. App.CEastland 1935, no writ)
(stating that it was Aevident@ that the entry of
judgment against R. A. Pearcy instead of A. R. Pearcy was clerical error and
not judicial error).





[62]See Kollman Stone, 574 S.W.2d at 250 n.2; see
also Daniels v. Comm=n for Lawyer Discipline, 142 S.W.3d 565, 573
(Tex. App.CTexarkana 2004, no pet.)
(reciting rule that a nunc pro tunc judgment relates back to the date of
original judgment); Gen. Elec. Co. v. Canyon City Ice & Light Co.,
136 S.W. 78, 79 (Tex. Civ. App.CFort Worth 1911, no writ) (same).





[63]Jamestown Partners, L.P.
v. City of Fort Worth, 83 S.W.3d 376, 384 (Tex. App.CFort Worth 2002, pet. denied) (stating that
permanent injunctions are reviewed for clear abuse of discretion).





[64]See BMC Software Belgium,
N.V. v. Marchand, 83 S.W.3d 789, 794B95 (Tex. 2002) (stating that in appeal from trial
to the court, appellant may challenge trial court=s findings for legal and
factual sufficiency of the evidence).





[65]See Glover v. Tex. Gen.
Indem. Co.,
619 S.W.2d 400, 401B02 (Tex. 1981) (stating
that if appellate court sustains challenge to factual sufficiency, it must
reverse judgment and remand for new trial).





[66]See Dow Chem. Co. v.
Francis,
46 S.W.3d 237, 241 (Tex. 2001) (stating that party attacking legal sufficiency
of adverse finding on issue on which party had burden of proof must demonstrate
on appeal that evidence establishes, as a matter of law, all vital facts in
support of issue). 





[67]Sullivan v. Barnett, 471 S.W.2d 39, 43 (Tex.
1971); Rancho Oil Co. v. Powell, 142 Tex. 63, 175 S.W.2d 960, 963
(1943). 





[68]Caulley v. Caulley, 806 S.W.2d 795, 797
(Tex. 1991); Sullivan, 471 S.W.2d at 43.





[69]Rancho Oil Co., 175 S.W.2d at 963; see
also Hudgins v. Thompson, 109 Tex. 433, 211 S.W. 586, 587 (1919). 





[70]Silvers v. Welch, 127 Tex. 58, 91 S.W.2d
686, 687B88 (1936).





[71]Rancho Oil Co., 175 S.W.2d at 963 (AThe acquiring of a new
home is not always the acquiring of a new homestead, and one does not
necessarily abandon a homestead by merely moving his home.@); see also Silvers,
91 S.W.2d at 688.





[72]Rancho Oil Co., 175 S.W.2d at 963; Burkhardt
v. Lieberman, 138 Tex. 409, 159 S.W.2d 847, 852 (1942) (citing Gouhenant
v. Cockrell, 20 Tex. 96, 1857 WL 5186, at *2 (1857)).





[73]See, e.g., Foreman v. Meroney,
62 Tex. 723, 1884 WL 8988, at *4 (1884) (A[A]bandonment is accomplished, not by going away
without any intention of returning at any particular time in the future, but by
going away with the definite intention never to return at all.@).





[74]See Caulley, 806 S.W.2d at 797
(stating that Aanyone asserting
abandonment has the burden of proving it by competent evidence@); Archibald v. Jacobs,
69 Tex. 248, 6 S.W. 177, 251 (1887) (AAbandonment of property actually homestead cannot
be accomplished by mere intention. There must be a discontinuance of the use,
coupled with an intention not again to use as a home.@); see also Gill v.
Quinn, 613 S.W.2d 324, 327 (Tex. Civ. App.CEastland 1981, no writ)
(noting that A[a]bandonment requires
both the overt act of discontinued use and intent to permanently do so@ and that Aburden of proving both
act and intention to abandon property as homestead rests on the person seeking
to subject it to forced sale@).





[75]See Hudgins, 211 S.W. at 588 (noting
that Athe best evidence of
homestead abandonment@ is proof that Aa new and permanent home
had been acquired@).





[76]See, e.g., Barrera v. State,
No. 14‑04‑01030‑CR, 2005 WL 1691037, at *5 (Tex. App.CHouston [14th Dist.] July
21, 2005, no pet.) (mem. op.) (including the fact that appellants used McAllen
address on driver=s licenses in list of
evidence that they had established new homestead in McAllen, thereby abandoning
Houston homestead).





[77]See Hinton v. Uvalde
Paving Co.,
77 S.W.2d 733, 736 (Tex. Civ. App.CDallas 1934, writ ref=d) (stating that if
parties did not intend to abandon their former home as a homestead, Athe continuity of this
intention@ was broken by their
mortgage of the property to secure a loan, @for it will not be assumed that they would be
parties to the void, illegal, and futile act of mortgaging their home‑stead@); see also Tex.
Const. art. 16, ' 50 (limiting the
validity of a lien created on homestead property to certain specific
transactions, which do not include the financing of a second home).





[78]Beck v. Avindino, 29 Tex. Civ. App. 500,
68 S.W. 827, 829 (Tex. Civ. App.CDallas 1902, no writ) (stating that renting of
homestead may be enough to show abandonment if renting is not temporary).





[79]See Paddock v. Siemoneit, 147 Tex. 571, 218
S.W.2d 428, 436 (1949) (stating that wife could lose homestead protection in
land only by abandonment or voluntary conveyance).





[80]Wharton v. Mortgage Bond
Co. of N.Y.,
48 S.W.2d 519, 522 (Tex. Civ. App. CFort Worth 1931, no writ) (stating that to
establish abandonment, A[i]t must appear that the
removal was with a definite purpose and intent to never return@); see also West Tex.
State Bank of Snyder v. Helms, 326 S.W.2d 47, 49 (Tex. Civ. App.CEastland 1959, no writ)
(stating that abandonment requires showing of Apresent, definite, and
permanent intent to cease to use the property@).





[81]See Ramsey v. Davis, 261 S.W.3d 811, 817 n.1
(Tex. App.CDallas 2008, pet. denied)
(noting that county records relating to homestead exemption are not
determinative of homestead status).





[82]See Tex. Tax Code Ann. ' 11.13(a), (j), (l)
(Vernon 2008). 





[83]See Dodd v. Harper, 670 S.W.2d 646, 649
(Tex. App.CHouston [1st Dist.] 1983,
no writ) (stating that A[t]o assert that
[constitutional homestead protection] could be voided by a mere failure to
designate the property as a homestead for tax purposes would be to render the
constitutional homestead protection meaningless@).





[84]See Hinton, 77 S.W.2d at 736. 





[85]See Dow Chem., 46 S.W.3d at 241.





[86]Tex. Fam. Code Ann. ' 3.003(a) (Vernon 2006).





[87]Id. ' 3.003(b).





[88]In re J.F.C., 96 S.W.3d 256, 265B66 (Tex. 2002).





[89]Columbia Med. Ctr. of Las
Colinas, Inc. v. Hogue, 271 S.W.3d 238, 248 (Tex. 2008); Diamond Shamrock Ref. Co. v.
Hall, 168 S.W.3d 164, 170 (Tex. 2005).





[90]Hogue, 271 S.W.3d at 248; Hall,
168 S.W.3d at 170.





[91]Hogue, 271 S.W.3d at 248; Hall,
168 S.W.3d at 170.





[92]Hogue, 271 S.W.3d at 248; Hall,
168 S.W.3d at 170.





[93]City of Keller v. Wilson, 168 S.W.3d 802, 817
(Tex. 2005); Hall, 168 S.W.3d at 170.





[94]Adams v. YMCA of San
Antonio,
265 S.W.3d 915, 917 (Tex. 2008); City of Keller, 168 S.W.3d at 827.





[95]Glover v. Henry, 749 S.W.2d 502, 503
(Tex. App.CEastland 1988, no writ);
Holloway v. Holloway, 671 S.W.2d 51, 57 (Tex. App.CDallas 1983, writ dism=d); Goodloe v.
Williams, 302 S.W.2d 235, 237B38 (Tex. Civ. App.CTexarkana 1957, writ ref=d); see also Broussard
v. Tian, 156 Tex. 371, 295 S.W.2d 405, 406B07 (Tex. 1956) (noting
that vendor=s lien note executed by
husband during marriage, when nothing in note or related instruments were to
the contrary, was by presumption a community obligation, and in absence of
showing otherwise, the community thereby acquired ownership in the property and
holding that evidence not sufficient to support jury finding of an agreement
between grantor and husband to make the note a separate obligation of husband
and the property therefore his separate estate), cert. denied, 353 U.S.
941 (1957).





[96]Glover, 749 S.W.2d at 503;
Holloway, 671 S.W.2d at 57.





[97]UBS Fin. Servs., Inc. v.
Branton,
241 S.W.3d 179, 189 (Tex. App.CFort Worth 2007, no pet.) (ABy signing a contract, a
party is presumed to have read and understood its contents.@).





[98]See Hogue, 271 S.W.3d at 248; Hall,
168 S.W.3d at 170; Broussard, 295 S.W.2d at 407 (stating that although
bank considered existence of husband=s separate property in making loan, that did not
reflect a contract that it was to be paid out of those properties or out of
husband=s separate property
generally); see also Brooks v. Sherry Lane Nat=l Bank, 788 S.W.2d 874, 877
(Tex. App.CDallas 1990, no writ)
(holding that when wife paid for property with inheritance from her mother,
property was in both spouses= names but considered by couple to be wife=s property, property was
then sold and proceeds placed in wife=s savings account, her husband considered account
to be wife=s separate property
though he was a signatory, and couple made an informal oral agreement before
opening account that account would belong to wife, this evidence did not rebut
presumption that property was community property).





[99]Tex. Fam. Code Ann ' 3.102(c). 





[100]Id. ' 3.102(a).





[101]Id.





[102]Id. ' 3.104(a).  But see Evans v. Muller, 510 S.W.2d 651,
655 (Tex. Civ. App.CAustin 1974) (stating
that predecessor statute Aby its terms, seems to
operate not for the benefit of the spouse, but instead for the protection of
those third persons who may deal with the spouse in possession or in whose name
the property is held@), rev=d on other grounds, 516 S.W.2d 923 (Tex.
1974); Cockerham v. Cockerham, 514 S.W.2d 150, 160 (Tex. Civ. App.CWaco 1974) (Hall, J.
dissenting) (stating that statute did not convert joint management community
property to sole management community property and thereby exempt it from
liability and that presumption provided by statute was intended to protect
third persons), rev=d in part and aff=d in part, 527 S.W.2d 162 (Tex.
1975).





[103]Tex. Fam. Code Ann. ' 3.202(b)(2).





[104]Stephens County Museum,
Inc. v. Swenson, 517 S.W.2d 257, 261 (Tex. 1975).





[105]See In re Marriage of
Murray, 15 S.W.3d 202, 205 (Tex. App.CTexarkana 2000, no pet) (stating that when deed
names more than one grantee without stating interest of each grantee,
presumption arises that each grantee is vested with title to equal undivided
interest).





[106]See Cockerham v.
Cockerham,
527 S.W.2d 162, 170 (Tex. 1975) (holding joint management of property
sufficiently established by fact that title to property was taken in both
spouses= names and both spouses
were obligated on note under which money to buy property was acquired);  Cooper v. Tex. Gulf Indus., Inc., 513
S.W.2d 200, 201B02 (Tex. 1974) (same).





[107]See Panhandle Baptist
Found., Inc. v. Clodfelter, 54 S.W.3d 66, 71 (Tex. App.CAmarillo 2001, no pet.).





[108]Tex. Land & Mortgage
Co. v. Cohen,
138 Tex. 464, 159 S.W.2d 859, 863 (1942); Clodfelter, 54 S.W.3d at 71B72.





[109]Nat=l Bank of Commerce v. May, 583 S.W.2d 685, 689B90 (Tex. Civ. App.CEastland 1979, writ ref=d n.r.e.) (noting that
after execution and delivery of deed, neither grantor nor grantee may alter or
destroy deed and thereby divest grantee of title to land as originally
described); see also Henson v. Peterson, 218 S.W. 126, 128 (Tex. Civ.
App.CTexarkana 1919, writ ref=d) (holding that after
grantor conveyed life estate to grantee with remainder to grantee=s children, grantor and
grantee could not subsequently by agreement enlarge grantee=s estate and divest
remaindermen of interest acquired under deed).





[110]But see Evans, 510 S.W.2d at 655.





[111]Tex. Fam. Code Ann. ' 3.102(c).





[112]Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998) (setting out standard of review for
challenges to legal sufficiency of evidence), cert. denied, 526 U.S.
1040 (1999); Robert W. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362B63 (1960).





[113]See Brooks, 788 S.W.2d at 877
(stating that although couple may have intended, prior to opening of accounts,
for wife to own accounts as her special community property, the intent was
superseded by opening of joint account with its joint right of control).





[114]See Patel v. Kuciemba, 82 S.W.3d 589, 596
(Tex. App.CCorpus Christi 2002, pet.
denied) (holding that stores were husband=s sole management community property when wife
worked at two stores but did not discuss or even know of decisions husband made
on investments, borrowing money, or running business and she never participated
in making loans for money to run stores where she worked).





[115]Cf. Montemayor v. Ortiz,
208 S.W.3d 627, 645 (Tex. App.CCorpus Christi 2006, pet denied) (holding that
store was wife=s special community
property when Aunequivocal evidence@ indicated that wife
maintained full control over management and operations of store, no community
capital assets were used to increase business, store was purchased with wife=s separate property, no
debts were incurred by both husband and wife to finance growth of store, and
store did not rely upon any community-owned real property).